## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## COLUMBIA DIVISION

JEFFREY ALAN CASEY,                )
                                        )
      Petitioner,                 )        NO.  1:06-0007
                                          )        JUDGE HAYNES
                                          )
                                          )
STATE OF TENNESSEE,                )
                                          )
      Respondent.                 )

## MEMORANDUM

Petitioner, Jeffrey Alan Casey, filed this pro se petition for writ of habeas corpus seeking to set aside his two convictions for first degree murder for which he received two concurrent life sentences. (Docket Entry No. 1). Upon review of the petition, the Court appointed the Federal Public Defender to represent the Petitioner. Petitioner filed an amended petition for writ of habeas corpus, (Docket Entry No. 31), with the following claims: (1) that his trial as an adult violated the Due Process Clause of the Fourteenth Amendment because the juvenile court's order transferring him to be tried as an adult failed to comply with Kent v. United States, 383 U.S. 541 (1966); (2) that as a result, the state trial court lacked authority to conduct his trial and impose his sentence thereby violating his right to due process; (3) that Petitioner received ineffective assistance of counsel at his transfer hearing in juvenile court due to his counsel's failure to present evidence of Petitioner's mental illness; and (4) that the actual innocence and miscarriage of justice doctrines toll the federal habeas limitation statute for these claims.

Before the Court is the Respondent's motion for summary judgment (Docket Entry No. 43) contending that Petitioner's petition is untimely under the statute of limitations for federal habeas petitions. In response, Petitioner relies upon his assertions of actual innocence and the

miscarriage of justice doctrine, his lack of the mental capacity to be tried as an adult, the juvenile court's violation of <u>Kent</u> that Petitioner contends, cures any procedural default in the state court and tolls the federal limitation statute for these claims. Petitioner argues that the state juvenile court's noncompliance with <u>Kent</u> results in his fundamentally unjust incarceration. This Court set an evidentiary hearing for February 9, 2009 (Docket Entry No. 40), but Petitioner did not offer proof on his claims. Both parties submitted memoranda relating to Respondent's motion for summary judgment.

## A. Procedural History

On June 23, 1983, Petitioner, then a minor, was charged with killing two women. <u>State v. Jeffery A. Casey</u>, 1985 Tenn. Crim. App. LEXIS 3074 at *1 (Tenn. Ct. Crim. App. March 27, 1985). <u>See also</u> Docket Entry No. 17-1. On June 28, 1983, the Decatur County Juvenile Court held hearing on whether to transfer the charges to the Decatur County Circuit Court for trial as an adult. (Docket Entry No. 19-1). After that hearing, the Juvenile Court ordered Petitioner's transfer for trial as an adult on the two murder charges. <u>Id</u>. After the juvenile judge's transfer of Petitioner to the Circuit Court, Petitioner was tried before a jury that convicted him of two counts of first degree murder. <u>Casey</u>, 1985 Tenn. Crim. App. LEXIS 3074 at *1 . On appeal, the Tennessee Court of Criminal Appeal affirmed Petitioner's convictions. <u>Id</u>. The Tennessee Supreme Court denied Petitioner's application for permission to appeal. (Docket Entry No. 17-1 at p. 7)

On May 9, 1996, Petitioner filed a petition for post-conviction relief that the trial court dismissed as untimely under state law. On appeal, the Tennessee Court of Criminal Appeals affirmed. <u>Casey v. State</u>, 1998 WL 74254 at *1 (Tenn. Ct. Crim. App. Feb. 24, 1998). On June 8,

2

1998, the Tennessee Supreme Court denied his application for permission to appeal.  Id.

On September 25, 2001 Petitioner filed a petition for writ of error coram nobis that the state trial court dismissed as time-barred and for failure to state a claim for coram nobis relief. On appeal, the Tennessee Court of Criminal Appeals affirmed the order of dismissal.  (Docket Entry No. 17-3) and on October 27, 2003, the Tennessee Supreme Court denied his application for permission to appeal. Id. at p. 6.

On March 15, 2004, Petitioner filed a petition for writ of habeas corpus in state court and presented his claim that the juvenile court failed to comply with provisions of state law in transferring his case to the criminal court to be tried as an adult, thereby depriving the criminal court of jurisdiction to try him.  The state court dismissed the petition without a hearing and the Tennessee Court of Criminal Appeals affirmed.  Casey v. State, 2005 WL 1931399 at **1-2 (Tenn. Ct. Crim. App. Aug. 11, 2005). On December 19, 2005, the Tennessee Supreme Court denied his application for permission to appeal. Id.

On January 30, 2006, Petitioner filed this action.  (Docket Entry No. 1).   The Court appointed counsel and Petitioner submitted an Amended Petition.  (Docket Entry No.

### B. Review of the State Record

### 1. The Juvenile Proceedings

The transcript of the transfer hearing in the Juvenile Court at which Petitioner was represented by counsel reflects the following:

Judge (J):     We are here today on the case of one Jeffrey A. Casey, is that right? Jeffrey A. Casey who has been charged I believe two counts hasn't he?

State (S):     (Inaudible) two counts of murder (inaudible).

3

| | |
|---|---|
| J: | Mr. Casey do you have hired counsel for , Jeffrey is that correct? (Inaudible). |
| J: | And you are representing Jeffrey Casey in this matter Mr. Kelly? |
| C: | That's correct. |
| J: | At this time I will entertain a state from the State. |
| S: | May it please the Court. (Inaudible) prepared to show that on the afternoon of January 28 at approximately 1:30 (inaudible) in (inaudible) County, (inaudible), Tennessee, this hearing can be had. Those present other than officers and members of the family (inaudible) myself Deputy Attorney General and my assistant (inaudible) McKinley. Juvenile Referee of the county are also present. Mr. Charles Kelly present represents the (inaudible) in the case who is Jeffrey A. Casey a juvenile age 17 who I understand will be 18 in November of this year. His mother is also present and all the other relatives who I do not know. |
| Female voice: | (inaudible) and this is his grandmother (inaudible). |
| S: | Okay, that you very much. The purpose of this hearing as I understand then the defense wishes to waive the statutory notice requirements of a certification hearing at this time. Would that be correct? |
| C: | Yes, we waive the notice (inaudible) revocation wish to be done with that at this time. |
| S: | Your Honor, the State calls up first witness (inaudible). |
| ? | Raise your right hand. Do you solemnly swear to tell the truth, the whole truth, and nothing but the truth in this case before so help you God? |
| Witness: | I do. |
| S: | (Inaudible). First of all, have you made an effort to ascertain the age of the defendant in this case (inaudible)? |
| W: | Yes sir I did. |

4

S:        What were you able to determine was his age?

W:       He's seventeen years old.

S:        We would stipulate that on his birthday he will be eighteen on November 26, 1983. He was born in 1965.

W:       That's correct.

S:        What are the charges that are now pending against Mr. Casey?

W:       Murder in the first degree, two counts.

S:        Who was killed in this case?

W:       Mary Priest and Tracy Priest.

S:        Did you investigate the scene to determine that in fact a homicide had take place?

W:       Yes sir I did.

S:        And at that time did the person that you have charged and the police department and prosecutor have charged is Jeffrey A. Casey.

W:       That's correct.

S:        I have no further questions.

C:        (Inaudible) did you have occasion to interview the subject?

W:       No sir I have not asked him any questions.

C:        Did you have occasion to interview any officers that did talk to Mr. Casey pertaining (inaudible)?

W:       Yes sir, I have.

C:        These officers, based upon the information obtained by these officers Jeffrey Casey was the subject that they talked to and charged with these homicides?

W:       That's correct. And also he was identified by the two surviving

5

members of the family as being the one who came in the house and shot the two deceased?

C:    **Your Honor, we have no, cannot (inaudible) contest the issue of his being tried as an adult.** Serious charges against him (inaudible) course we don't stipulate to it or agree to it. (Inaudible).[1]

J:    I (inaudible) your going.

S:    At this time your Honor with the court's permission (inaudible) draft an order while Mr. Casey is here and have the secretary upstairs type it. Sign the order and then (inaudible).

S:    Your Honor at this time the State would ask that this man be held without bond (inaudible) have bond but our position in this case is it's capital case although he's a juvenile (inaudible) hearing we think that at this time he should be held without bond. Of course he may have an opportunity another time to come back (inaudible) or someone else. That's our position.

J:    You've heard the state's position Mr. Kelly. Do you wish to comment on this?

C:    Your Honor we would ask that bond be set (inaudible).

J:    I believe that due to the nature of the case and the safety of the defendant that I don't' think it would be wise at this time to even set a bond. I believe that I would feel safer myself if I refuse to set bond at this time. That doesn't mean that he will never be denied a bond but at this time I would rather not set a bond. Alright, that's all.

(Petitioner's Collective Exhibit No. 3 from February 9, 2009 hearing, at pp. 1-3).

---

[1] The Court notes that Petitioner submitted his own transcription of the state hearing, that reflects that his counsel as stating: "Your honor we have no, and I seriously contest the issue of his being tried as an adult with the seriousness of the charges against him of course we don't particularly agree to it." Petition also submitted a copy an audiotape reflecting the Juvenile Transfer Hearing as Exhibit A to Docket Entry No. 22. Based upon the Court's review of the audio tape, Petitioner's Collective Exhibit No. 3 more accurately summarizes the comments of counsel on this point.

6

After that hearing, the Juvenile Judge entered an "ORDER OF CERTIFICATION" that transferred petitioner to be tried as an adult on the murder charges. This Order reads in total as follows:

This cause came on to be and was heard in the Juvenile Court of Decatur County, the Honorable Grady Crawley presided.

It appeared to the court that **the defendant by and thru (sic) his counsel of record in open court waived the statutory notice requirement of TCA 37-234(3).** It further appeared to the court from the testimony of witnesses in open court the statement of counsel and the entire record as a whole that the defendant at the time of the alleged crime was seventeen (17) years of age, and that the defendant was charged with 2 COUNTS OF MURDER IN THE 1ST DEGREE and that the defendant was and hereby is certified to the next term of Circuit Court of Decatur County to be tried as an adult in accordance with TCA 37-234. The court was further of the opinion at the time the defendant should be held without bond.

ALL OF THE ABOVE IS ORDERED, ADJUDGED AND DECREED.

Enter this the 28th day of June, 2003.

(Docket Entry No. 31-1, at p. 1). Petitioner asserts without dispute that the juvenile judge is not a lawyer and requests judicial notice of that fact.

### 2. State Appellate Findings

In his direct appeal, the Tennessee Court of Criminal Appeals made the follow finding of facts on the murder charges.

The defendant, a 17-year old boy, was convicted of the shotgun slaying of his 16-year old girlfriend, Tracy Priest, and her mother, Mary Priest. His defense was that he was insane at the time of the shootings.

The defendant, a black high school student, was well liked, athletic young man with good scholastic standing. He had a strong attachment towards his white girlfriend, who was in an early stage of pregnancy. Before the shootings occurred, the victim Mary Priest told the defendant that he could not continue to have dates with Tracy Priest.

7

Between 10:30 and 11:00 on the evening of June 23. 1983, the defendant, armed with a shotgun, went to the mobile home in Decatur County where the two victims lived with two other younger daughters of Mary Priest. When the defendant arrived, Mary Priest went to the door and the defendant shot her through the glass door with the shotgun. Tracy Priest fled to the bathroom but the defendant followed her there and shot her four times with the shotgun. The wounds inflicted on both victims were fatal. After the defendant left the mobile home, he told a young friend that he had shot the two women and needed to make an escape to Germany where he had a relative.

The facts surrounding the double homicide are undisputed. There is conflict in the evidence with respect to the sanity of the defendant at the time of the shooting and the sufficiency of the evidence to establish sanity is the basis for the first issue.

(Docket Entry No. 17-1, at pp. 2-3).

The Tennessee Court of Criminal Appeals also made specific findings of fact, based upon the trial record, on the issue of the Petitioner's mental status.

Dr. John Filley testified concerning the defendant's mental health, in part:

"Q. What is your opinion concerning that?

A. The final diagnosis that I arrived at was that of an adjustment disorder with disturbance of both emotions and conduct. This is a degree of emotional upset short of being a serious mental disorder. It's a significant upset in a person, but one that an ordinary person might encounter in any major life situation, **when they're under some stress, without being severely mentally ill and need a hospitalization or extensive treatment.**

Q. Is this the type of thing that any number of people in this courtroom might have?

A. Yes, when faced with divorce, faced with criminal actions, faced with a number of life circumstances that were somewhat stressful.

Q. And this is the type of order which you have classified him as having?

A. That's correct.

Q. All right, get into question number 2 as I understand you. Could Jeffery Casey

8

at the time of this alleged incident, June 23rd, 1983, in your opinion, did he know right from wrong?

A. In the sense of understanding what the expectations of law were and that his behavior was a violation of law, we could not find any evidence that he did not understand that.

Q. In other words, -

A. We were satisfied that he did.

**Q. He did know right from wrong?**

**A. Yes.**

Q. All right, moving on to the third thing. **Could he substantially conform his conduct to the requirements of the law at that time? Because of mental illness or defect?**

**A. We could not find a mental illness reason why he did not. that is correct. Ordinarily to say that there was a mental illness reason why a person could not conform would be because they had some sort of delusional belief that forced them to behave in a way that was at odds with what the law said they should do, or where they were severely impaired in their thinking and judgment about ths situation. We did not find that degree of impairment of thinking.**

Q. So, in your opinion he could have conformed his conduct to the requirements of the law?

A. Yes.

Q. But for whatever reason he chose not to.

A. He did not, yes."

The defendant was examined by Dr. Melvin Golden, a psychiatrist, on June 30. 1983. Dr. Golden had access to the defendant's personal history and to the results of psychological testing performed on the defendant by Mr. Tom Richardson, a psychological examiner. Dr. Golden testified that as a result of his evaluation a week after the shootings and the defendant's history, he "speculated" that the defendant was suffering from "brief reactive psychosis." Dr. Golden was of the opinion that the defendant knew the difference between right and wrong and when

9

asked whether the mental illness rendered the defendant substantially incapable of conforming his conduct to the requirements of the law. Dr. Golden stated that he could not answer that question "yes or no." He explained, "I raise a shadow of doubt. I believe that due to his state at that point and time that there was reason to believe that he might well not been able to conform to his behavior in a general consent to his standards."

**Defense witness Tim Richardson, psychological examiner in private practice, examine the defendant on June 29. 1983. Based on the defendant's personal history and numerous psychological tests, Mr. Richardson concluded that the defendant was suffering from paranoid schizophrenia and was irrational at the time of the shootings. Mr. Richardson was of the opinion that the defendant did not have the capacity to conform his conduct to the requirements of the law.**

(Docket Entry No. 17-1, at pp. 3-5) (emphasis added).

The Petitioner did not submit any proof at the evidentiary hearing in this action, but cites

the trial court record reflecting Petitioner's psychological examiner's testimony about the

Sheriff's report of newspaper accounts that "immediately upon his incarceration he attempted to

take his own life and wrote on the cell walls "I love you, Tracy" or something to that effect in

blood." (Petitioner's Collective Exhibit 2 from February 9, 2009 hearing, Vol. III, at p. 355).

Based upon the psychological testing of Petitioner and an interview, Dr. Richardson, the

psychological examiner, opined that petitioner was unable to conform his conduct to the

requirements of the law and that Petitioner exhibited "some residual signs of thought process

disturbance or schizophrenia." Id. at 354-55. The State's psychiatrist testified at trial as to his

"speculation" that Petitioner exhibited a condition consistent with a diagnosis of brief reactive

psychosis that "could last a few hours, but less than two weeks." Id. at pp. 308, 310. Petitioner

contends that his counsel should have investigated his mental condition prior to the transfer

hearing in the juvenile court and presented expert testimony on his mental condition at the

10

transfer hearing that would have precluded his transfer to be tried as an adult.

## C. Conclusions of Law

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), as codified in 28 U.S.C. § 2244(d)(1), provides a one year statute of limitations for § 2254 habeas corpus petitions attacking judgments that became final after the effective date of the statute. The statute begins to run from the latest of:

    (A)    The date on which the judgment became final by the conclusion of direct review of the expiration of the time for seeking such review;

    (B)    The date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

    (C)    The date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

    (D)    The date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).

The Petitioner concedes his petition is untimely under the habeas statute of limitations, but relies upon equitable tolling, due to the juvenile judge's failure to examine Petitioner and certify that he was sane and able to stand trial as an adult in accordance with Tennessee law. Petitioner contends lack of a proper hearing as equivalent of "actual innocence" and results in an fundamentally unfair incarceration for purposes of equitable tolling for his Kent and ineffective assistance of counsel claim for his juvenile transfer proceeding. (Docket Entry No. 31, Petitioner's Amended Petition, at pp. 11-12).

11

In House v. Bell, 547 U.S. 518 (2006), the Supreme Court recognized and explained

fundamentally unfair incarceration or miscarriage of justice exception to the procedural default

rule:

> As a general rule, claims forfeited under state law may support federal habeas
> relief only if the prisoner demonstrates cause for the default and prejudice from
> the asserted error. The rule is based on the comity and respect that must be
> accorded to state-court judgments. The bar is not, however, unqualified. In an
> effort to "balance the societal interests in finality, comity and conservation of
> scarce judicial resources with the individual interest in justice that arises in the
> extraordinary case," the Court has recognized a miscarriage-of-justice exception.
> "[I]n appropriate cases," the Court has said, "the principles of comity and finality
> that inform the concepts of cause and prejudice must yield to the imperative of
> correcting a fundamentally unjust incarceration."

Id. at 536 (citations omitted).

The Court addresses whether Petitioner's contentions qualify for this exception. Under

the Tennessee statute on juvenile transfer hearings, Tenn. Code Ann. § 37-1-134 sets forth the

juvenile judge's obligations as follow:

> (a) After a petition has been filed alleging delinquency based on conduct that is
> designated a crime or public offense under the laws, including local ordinances, of this
> state, the court, before hearing the petition on the merits, may transfer the child to the
> sheriff of the county to be held according to law and to be dealt with as an adult in the
> criminal court of competent jurisdiction. The disposition of the child shall be as if the
> child were an adult if:
>
> (1) The child was sixteen (16) years or more of age at the time of the alleged
> conduct, or the child was less than sixteen (16) years of age if such child was
> charged with the offense of first degree murder, second degree murder, rape,
> aggravated rape, rape of a child, aggravated robbery, especially aggravated
> robbery, kidnapping, aggravated kidnapping or especially aggravated kidnapping
> or an attempt to commit any such offenses. The district attorney general may not
> seek, nor may any child transferred under the provisions of this section receive, a
> sentence of death for the offense for which the child was transferred;
>
> (2) A hearing on whether the transfer should be made is held in conformity with

12

§§ 37-1-124, 37-1-126 and 37-1-127[2];

(3) Reasonable notice in writing of the time, place and purpose of the hearing is given to the child and the child's parents, guardian or other custodian at least three (3) days prior to the hearing; and

(4) The court finds that there are reasonable grounds to believe that:

    (A) The child committed the delinquent act as alleged;

    (B) The child is not committable to an institution for the developmentally disabled or mentally ill; and

    (C) The interests of the community require that the child be put under legal restraint or discipline.

(b) In making the determination required by subsection (a), the court shall consider, among other matters:

---

[2] As pertinent here, Tenn. Code Ann. § 37-1-124(a) requires the hearing to be held in an "informal but orderly manner" with the state prosecutor presenting evidence and allowing the exclusion of public and preservation of the court's minutes. Tenn. Code Ann. § 37-1-126 directs the appointment and payment of counsel for needy children. Tenn. Code Ann. § 37-1-127 sets forth other procedures and individual protections for the transfer hearing.

    (a) A party is entitled to the opportunity to introduce evidence and otherwise be heard in the party's own behalf and to cross-examine adverse witnesses.

    (b) A child charged with a delinquent act need not be a witness against self-interest or otherwise engage in self-incrimination.

    (c) An extra-judicial statement, if obtained in the course of violation of this part or that would be constitutionally inadmissible in a criminal proceeding, shall not be used against the child.

    (d) Evidence illegally seized or obtained shall not be received over objection to establish the allegations made against the child.

    (e) A confession validly made by a child out of court is insufficient to support an adjudication of delinquency unless it is corroborated in whole or in part by other evidence.

Tenn. Code Ann. § 37-1-127(a) through (e).

13

(1) The extent and nature of the child's prior delinquency records;

(2) The nature of past treatment efforts and the nature of the child's response thereto;

(3) Whether the offense was against person or property, with greater weight in favor of transfer given to offenses against the person;

(4) Whether the offense was committed in an aggressive and premeditated manner;

(5) The possible rehabilitation of the child by use of procedures, services and facilities currently available to the court in this state; and

(6) Whether the child's conduct would be a criminal gang offense, as defined in § 40-35-121, if committed by an adult.

(c) The transfer pursuant to subsection (a) terminates jurisdiction of the juvenile court with respect to any and all delinquent acts with which the child may then or thereafter be charged, and the child shall thereafter be dealt with as an adult as to all pending and subsequent criminal charges; provided, that if a child transferred pursuant to this section is acquitted in criminal court on the charge or charges resulting in such transfer, or if such charge or charges are dismissed in such court, this subsection (c) shall not apply and the juvenile court shall retain jurisdiction over such child.

(d) If a person eighteen (18) years of age or older is to be charged with an offense that was alleged to have been committed prior to such person's eighteenth birthday, the petition shall be brought in the juvenile court that would have had jurisdiction at the time of the offense. The juvenile court shall either adjudicate the case under its continuing jurisdiction authority under § 37-1-102(b)(4)(B) and (C) or undertake transfer proceedings consistent with this section.

(e) No child, either before or after reaching eighteen (18) years of age, shall be prosecuted for an offense previously committed unless the case has been transferred as provided in subsection (a).

(f)(1) Statements made by the child at the juvenile court hearing under this section are not admissible against the child, over objection, in the criminal proceedings following the transfer.

(2) In any county in which, on July 1, 1996, the general sessions court or juvenile court makes audio recordings, the court shall make or cause to be made an audio

14

recording of each transfer hearing conducted pursuant to this section. Such recording shall include all proceedings in open court and such other proceedings as the judge may direct and shall be preserved as a part of the record of the hearing. The juvenile who is the subject of the hearing may, at the juvenile's own expense, transcribe the recording of the hearing and a transcript so prepared may be used for the purpose of an appeal as provided by law. In all other counties, transfer hearings shall be recorded using the procedure provided in title 40, chapter 14, part 3.

(g) If the case is not transferred, the judge who conducted the hearing shall not over objection of an interested party preside at the hearing on the petition. If the case is transferred to a court of which the judge who conducted the hearing is also the judge, the judge likewise is disqualified from presiding in the prosecution.

Tenn. Code Ann. §§ 37-1-134 (a) through (g). Petitioner contends that the juvenile judge did not make any findings required by Tenn. Code Ann. §§ 37-1-134 (a)(4).

In Kent v. United States, 383 U.S. 541 (1966), a District of Columbia statute vested a juvenile court with authority to transfer juveniles to be tried as adults, but only after "a full investigation." Id. at 547 (quoting D.C. Code § 11-94-914 (1961)). There, the juvenile court did not conduct a hearing nor issue findings to justify its transfer of jurisdiction over the juvenile. Id. at 546. In sum, the Supreme Court remanded for a hearing to determine de novo whether the transfer was appropriate, id. at 565, after "a full investigation." Id. at 552-553. For due process purposes, the Supreme Court required the juvenile court process to have "procedural regularity sufficient in the particular circumstances to satisfy the basic requirement of due process and fairness, as well as compliance with the statutory requirement of a 'full investigation.'" Id. at 553. In particular, the Kent court concluded that due process required a hearing with effective assistance of counsel, and a statement of reason for the transfer. Id. at 534. "[W]e hold that it is incumbent upon the Juvenile Court to accompany its waiver order with a statement of reasons or

15

considerations therefor." Id. at 561.

The Sixth Circuit has rendered two decisions that provide guidance on any non-compliance with Kent. In Spytma v. Howes, 313 F.3d 363, 365 (6th Cir. 2002), the Sixth Circuit considered three Kent claims: "(1) whether his transfer to adult court was lawful; (2) whether his jury waiver was knowing and intelligent; and (3) whether he received ineffective assistance of counsel". The factual context for these claims was as follows:

> The probate judge did not make specific findings on each of the listed criteria in Rule 11.1 as required by the Juvenile Court Rules. For example, no one, including petitioner's mother, testified about his home life or his education, including the fact that he was not a good student, there was no testimony explaining that he had finished only the eighth grade, nor was there any testimony concerning the fact that his mother had been divorced three times. In addition, the judge did not make the required finding as to the "relative suitability of available programs and facilities" except to state that he could not think of any that were appropriate.

Id. at 365.

In resolving these claims, the Court did not adopt a per se rule that noncompliance with Kent would result in an award of habeas relief and adopted a standard of whether a "reasonable . . . judge would have transferred petitioner to adult court" and whether there was "substantial compliance" with Kent:

> The question is whether, under the circumstances of this case, the failure to make all the required findings under state law on the record violated petitioner's constitutional due process rights. Our analysis here is guided by Deel v. Jago, 967 F.2d 1079 (6th Cir.1992). . . . . "treat a child as an adult based solely on the severity of a single crime may be unwise, but it is not unconstitutional when done in accordance with a valid transfer statute . . . . " Deel, 967 F.2d at 1090 (emphasis in original).

> *   *   *

> . . . . any error in the transfer proceeding is subject to harmless error analysis. . . .

16

Although the judge failed fully to consider on the record the waiver criteria established under Michigan law, it is likely that any "reasonable" probate judge would have transferred petitioner to adult court. As concluded by the Magistrate Judge, there is "perhaps a legitimate question" as to whether the probate court satisfactorily complied with the state juvenile transfer statute for federal constitutional purposes, but any error was harmless given the circumstances because **no "reasonable" judge would have denied the transfer**. In addition, the state trial court concluded after the 1996 evidentiary hearing that the "probate judge did not comply with the statute." Trans. of Evid. Hearing at 153, Apr. 30, 1996. The court concluded, however, that **there was "substantial compliance" with the transfer statute because the probate judge was aware of all the factors, but just did not articulate them.** The state court also concluded that any error was harmless because no reasonable probate judge would have failed to waive jurisdiction given the brutality of the crime.

Id. at 369, 370 (emphasis added).

In Crick v. Smith, 650 F.2d 860, 871(6th Cir. 1981) the Sixth Circuit addressed a Kent claim in the context of a procedural default under the then deliberate by-pass doctrine and remanded the action for a harmless error determination on the issue of procedural default. In Crick, "the juvenile court judge failed to incorporate the specific finding of "best interests of the child and of the public," and the reasons for the finding, formally in the transfer order or elsewhere in the record. Id. at 863. The district court found that the Kent claim warranted review and habeas relief. Id. In reversing that decision, the Sixth Circuit ruled such non-compliance with Kent could be harmless error:

We hold that the harmless error rule of Chapman v. California, 386 U.S. 18 (1967) can be applied in the context of the constitutional error involved in this case . . . .

\*   \*   \*

We are bound at the outset to observe that here, unlike Kent, the petitioner appears to have been accorded a full hearing in the juvenile court, at which he was provided counsel. No challenge to the completeness, fairness, or procedural regularity of that hearing is made. The sole flaw, it appears, came after the hearing

17

when the juvenile court judge failed to incorporate the specific finding of "best interests of the child and of the public," and the reasons therefor . . . .

This distinction from the facts in <u>Kent</u> is important, not because it removes the constitutional flaw altogether, but because it demonstrates that much of the potential for injury present in <u>Kent</u> is not present here.

We conclude, therefore, that if the district court properly reached the issue, it also properly found that at least a technical violation of due process occurred when the juvenile judge failed to incorporate the necessary specific findings and reasons in the transfer order or record . . . ."

<u>Id</u>. at 863-64.

The Sixth Circuit vacated the judgment and remanded the case. <u>Id</u>. at 871. The Sixth Circuit further stated:

We instruct the district judge first to consider the application of the harmless error rule as defined in [<u>Chapman</u>]

Second, If the district judge concludes that he may not fairly apply the harmless error rule, he shall then proceed to consider the question of whether Crick's transfer was nevertheless appropriate under Kentucky law.

<u>Id.</u>

Here, petitioner waived his right to a transfer hearing with the assistance of counsel.

There is not any proof that Petitioner did not make this waiver knowingly and voluntarily. There

is not any proof that Petitioner's counsel at the juvenile transfer hearing did not provide effective

assistance of counsel. At the time of the transfer hearing in the juvenile court, the undisputed

facts established "reasonable grounds to believe that . . . [Petitioner] committed the delinquent

act as alleged" and that given the nature of the offenses that "[t]he interests of the community

require that the [Petitioner] be put under legal restraint or discipline." Tenn. Code Ann.§ 37-1-

134(a)(4)(A) and (C).

18

As to his counsel's failure to investigate Petitioner's mental condition before the juvenile transfer hearing, the pertinent Tennessee statute requires proof that Petitioner was "not committable to an institution for the developmentally disabled or mentally ill." Tenn. Code Ann.§ 37-1-134(a)(4)(B). There is not any evidence in the state court record nor in the record before this Court that an expert would establish Petitioner's eligibility for commitment under Tenn. Code Ann.§ 37-1-134(a)(4)(B). Such a showing would be necessary to impute any prejudice for the alleged ineffectiveness of Petitioner's counsel at the juvenile transfer hearing. The state court record reflects that whatever mental condition the Petitioner had at the time of these events, that condition did not qualify as requiring an institutional commitment. As the Tennessee appellate court found:

> Dr. John Filley testified concerning the defendant's mental health in part:
>
> "Q. What is your opinion concerning that?
>
> A. The final diagnosis that I arrived at was that of an adjustment disorder with disturbance of both emotions and conduct. This is a degree of emotional upset short of being a serious mental disorder. It's a significant upset in a person, but one that an ordinary person might encounter in any major life situation, when they're under some stress, **without being severely mentally ill and need a hospitalization or extensive treatment.**

(Docket Entry No. 17-1 at pp. 3-5) (emphasis added). Dr. Richardson, the cited defense expert did not testify that Petitioner should be institutionalized. The State's expert testified that at the speculative level, Petitioner exhibited a condition consistent with a diagnosis of brief reactive psychosis that "could last a few hours, but less than two weeks." (Petitioner's Collective Exhibit

19

No. 2 from February 9, 2009 hearing, Vol. III, at pp. 308, 310).

For Petitioner's contentions of actual innocence and miscarriage of justice as justifying the tolling of the statute of limitation for federal habeas actions, as stated in <u>House</u>, 547 U.S. at 536, the controlling case is <u>Schulp v. Delo</u>, 513 U.S. 298 (1995). The habeas petitioner must present new evidence of his innocence because, "[w]ithout any **new evidence of innocence**, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim." <u>Schulp</u>, 513 U.S. at 316 (emphasis added). "To be credible, such a claim requires the petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." <u>Id.</u> at 324. This "reliable new evidence" must be "so strong that a court cannot have confidence in the outcome of the trial," <u>id</u>. at 316, so that it is "[m]ore likely than not that no reasonable juror would have found [petitioner] guilty beyond a reasonable doubt." <u>Id.</u> at 327.

In <u>Schlup</u>, the Supreme Court addressed the Court's responsibility in evaluating the "new reliable evidence":

> The <u>Carrier</u> standard is intended to focus the inquiry on actual innocence. In assessing the adequacy of petitioner's showing, therefore, the district court is not bound by the rules of admissibility that would govern at trial. Instead, the emphasis on "actual innocence" allows the reviewing tribunal also to consider the probative force of relevant evidence that was either excluded or unavailable at trial. Indeed, with respect to this aspect of the <u>Carrier</u> standard, we believe that Judge Friendly's description of the inquiry is appropriate: The habeas court must make its determination concerning the petitioner's innocence "in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial."

20

\* \* \*

The meaning of actual innocence as formulated by <u>Sawyer</u>, and <u>Carrier</u> does not merely require a showing that a reasonable doubt exists in the light of the new evidence, but rather that no reasonable juror would have found the defendant guilty. It is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses; rather the standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do. Thus, a petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.

\* \* \*

. . . [U]nder the gateway standard we describe today, the newly presented evidence may indeed call into question the credibility of the witnesses presented at trial. In such a case, the habeas court may have to make some credibility assessments. Second, and more fundamentally, the focus of the inquiry is different under <u>Jackson</u> than under <u>Carrier</u>. Under <u>Jackson</u>, the use of the word "could" focuses the inquiry on the power of the trier of fact to reach its conclusion. Under <u>Carrier</u>, the use of the word "would" focuses the inquiry on the likely behavior of the trier of fact.

. . . Under <u>Carrier</u>, in contrast, the habeas court must consider what reasonable triers of fact are likely to do. Under this probabilistic inquiry, it makes sense to have a probabilistic standard such as "more likely than not." Thus, though under Jackson the mere existence of sufficient evidence to convict would be determinative of petitioner's claim, that is not true under <u>Carrier</u>.

\* \* \*

In applying the <u>Carrier</u> standard to such a request, the District Court must assess the probative force of the newly presented evidence in connection with the evidence of guilt adduced at trial. Obviously, the Court is not required to test the new evidence by a standard appropriate for deciding a motion for summary judgment . . . . Instead, the court may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence.

<u>Id.</u> at 327-332 (footnotes omitted). To make a showing of gateway actual innocence, a petitioner needs to present the habeas court with evidence "not presented at trial." <u>Id.</u> at 324.

21

Here, there is not any new evidence to meet the Schulp standard. To be sure, Petitioner cites evidence at his trial of his emotional and mental condition prior to his trial, but that evidence is not new. Considering Petitioner's counsel citations to portions of the state record on the Petitioner's mental condition and the trial record reveals a dispute among mental health care providers about Petitioner's mental condition. In any event, there is not any new evidence to demonstrate actual innocence or miscarriage of justice required by Schulp. As a structural error, in the Sixth Circuit, Kent errors are not the type of structural errors for which a habeas petitioner is automatically entitled to relief. Without additional proof to undermine the Petitioner's waiver of the transfer hearing with the assistance of counsel, the Court concludes that Petitioner cannot make the requisite showing of prejudice. Thus, the Court concludes that the Petitioner is not entitled to habeas relief under the actual innocence or miscarriage doctrine.

In closing, Petitioner cites prior Supreme Court precedents that set aside convictions for the sentencing court's lack of jurisdiction. (Docket Entry No. 45, Petitioner's Memorandum at pp 11-12). Here, Petitioner waived the transfer issue with the assistance of counsel and thus, the state trial court did possess jurisdiction over the Petitioner for the trial on the murder charges. Those decisions are factually inapposite.

Accordingly, the petition for the writ of habeas corpus (Docket Entry No. 1, 31) should be denied and the Respondent's motion for summary judgment (Docket Entry No. 43) should be granted.

An appropriate Order is filed herewith..

Entered this the 19th day of March, 2009.

22

William J. Haynes, Jr
United States District Judge

23